H. E. BUSH, *as Sheriff of Shawnee County*, v. CHARLES COLLINS.

1. FRAUDULENT SALE; *Title of Purchaser; Notice.* Where an insolvent and failing merchant makes a sale of all of his goods and merchandise for the purpose of defrauding his creditors, no one but a purchaser for a valuable consideration actually passed before notice of the fraud can, as against attaching creditors, claim title to the property which has been fraudulently disposed of.

2. PURCHASER, *Protected to What Extent.* Where a party purchases from an insolvent and failing merchant a stock of goods, and the merchant makes such sale with the purpose to defraud his creditors, and the purchaser thereof has no actual or constructive notice of the fraud at the time of his purchase, but subsequently and before the payment of all the consideration of his purchase has actual notice thereof, he can only be protected to the extent of the money actually paid, or the security or property actually appropriated by way of payment before notice. If notice of the fraud is after payment of a part of the purchase-money, the purchaser is only entitled to reimbursement for the money paid or the security or property actually appropriated by the seller as payment. He is not to be regarded as a purchaser for a valuable consideration as to the purchase money not paid.

*Error from Wyandotte District Court.*

ACTION brought February 21, 1883, by *Charles Collins* against *H. E. Bush*, as sheriff of the county of Shawnee.

The petition is in words and figures as follows, (omitting court, title, and exhibit:)

"1. The plaintiff, Charles Collins, complains of the defendant, H. E. Bush, sheriff of Shawnee county, of the state of Kansas, and for cause of action against the defendant says: That the plaintiff is now, and was at all the time hereinafter complained of, a citizen of the state of Kansas; that the defendant is now, and was at all times hereinafter complained of, a citizen of the state of Kansas, and duly elected, qualified and acting sheriff of the county of Shawnee, in said State of Kansas; and in all the matters hereinafter stated and complained of against him, acted in the capacity of sheriff of the county of Shawnee, in the State of Kansas.

"On the 7th day of October, 1882, and for a long time prior thereto, the plaintiff was the owner of, and in the actual possession thereof, of a large and valuable stock of merchandise in the city of Topeka, in the county of Shawnee and state of Kansas, consisting of groceries, clothing, furnishing goods, hats and caps, outfitting store, and other merchandise, of the aggregate value of twenty-five thousand dollars, and which stock of merchandise is more particularly and in detail described, with the separate value of each item thereof opposite thereto, in a certain schedule hereto attached, marked 'Schedule A,' and made a part of this petition.

"On the day last aforesaid, the defendant, H. E. Bush, sheriff of the county of Shawnee, in the state of Kansas, and in his capacity of said sheriff, wrongfully and tortiously seized and took into his possession and from the possession of the plaintiff, and at the county of Shawnee aforesaid, the entire stock of merchandise hereinbefore mentioned, and every item thereof embraced and stated in said schedule A, to his own use.

"On the date aforesaid the plaintiff demanded of and from the defendant the return to him of said entire stock of merchandise and each and every part thereof, and the plaintiff avers and charges the same to be true that although the defendant then and before that time well knew that the plaintiff was the owner thereof, and was actually in the quiet and peaceable possession thereof before the unlawful taking hereinbefore stated, and was lawfully entitled to the possession thereof after the taking of the same aforesaid, the defendant upon said demand and at all times thereafter refused and still refuses to return said stock of merchandise or any part there-

of, to the damage of plaintiff in the sum of twenty-five thousand dollars, with interest thereon from the 7th day of October, 1882.

"Wherefore, the plaintiff asks judgment against the defendant, H. E. Bush, sheriff of the county of Shawnee, in the state of Kansas, for the sum of twenty-five thousand dollars and interest thereon at 7 per cent. per annum from October 7, 1882, and costs of suit."

On March 23, 1883, the defendant filed the following answer, (omitting court and title :)

"And now comes the defendant, and for answer to the petition of plaintiff, denies each and every allegation in said petition contained.

"2d. And for a second offense, the defendant alleges that at the time of the alleged taking of said goods and chattels in said petition mentioned, the defendant was the sheriff of the county of Shawnee, in the state of Kansas, and that said goods and chattels were the property of A. D. McMillan and Wm. McMillan & Co.; that at that time various and several writs of attachment had been issued from the office of the clerk of the district court of said county at the action of and in suits brought by the McCord & Nave Mercantile Company, a corporation organized under the laws of the state of Missouri, the Gauss-Hunicke Hat Company, a corporation organized under the laws of the state of Missouri, and Isaac Weill, Isadore Weill, and A. Steinaker & Co.; and also in suits and actions brought in said court by others against the said A. D. McMillan & Co., and against the property of said A. D. McMillan & Co., and duly delivered to defendant as such sheriff; and if defendant took the said goods and chattels, he took them as sheriff as aforesaid, and by virtue of said several writs of attachment, as he might and ought rightfully to do; and that if the plaintiff claims said goods and chattels, he claims under a pretended sale from A. D. McMillan & Co.; but that such pretended sale, if any was made, was a fraudulent one and void, and made with the intent to defraud the creditors of the said A. D. McMillan & Co., and especially the plaintiffs in the attachment suits above mentioned. Wherefore, defendant prays judgment."

On April 11, 1883, the plaintiff filed a reply, denying each and every material allegation contained in the answer. On August 4, 1883, upon the application of the plaintiff, the place

of the trial of the action was changed from the district court of Shawnee county, and by consent of all the parties sent to the district court of Wyandotte county for trial. Trial had at the July Term of court for 1884, before a jury. The jury returned a verdict for the plaintiff, and assessed his damages at $9,000. The defendant filed his motion for a new trial, which (omitting court and title) is as follows:

"Comes now the defendant, and moves the court here to set aside the verdict herein and grant a new trial, because of—

"1. Error of law occurring at the trial and excepted to by the defendant.

"2. The verdict is not sustained by sufficient evidence, is contrary to the evidence and is contrary to law.

"3. Misconduct of the prevailing party, the plaintiff, where attorney upon the trial of said cause indulged in improper and abusive language respecting the counsel for defendant, commenting upon matters not in evidence, and making statements to the jury respecting the same which are not true.

"4. Error of the court upon the trial in refusing each and every of the special instructions prayed for by the defendant.

"5. Error of the court upon the trial in each and every of the instructions given to the jury.

"6. Misconduct of the jury.

"7. Accident and surprise which ordinary prudence could not have guarded against.

"8. The court erred upon the trial in overruling the objections of the defendant to the introduction of evidence offered by the plaintiff.

"9. The court erred upon the trial in sustaining the objections of the plaintiff to evidence offered by defendant."

This motion was overruled, and judgment entered upon the verdict in favor of the plaintiff and against the defendant for the sum of $9,000, together with all costs, taxed at $160.70. The defendant excepted to the rulings and judgment of the court, and brings the case here.

*Case & Moss, Rossington, Smith & Dallas, Nathan Cree, W. P. Douthitt,* and *J. D. McFarland,* for plaintiff in error.

*J. S. Ensminger, Frank Herald,* and *Waters & Chase,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: The facts in this case, not contradicted, are as follows: A. D. McMillan and William Quigley, under the firm-name of A. D. McMillan & Co., opened a wholesale store in North Topeka, in this state, in August, 1882, for the sale of groceries, boots and shoes, hats and caps, and clothing. They continued in business until October 7, 1882, paying for only a few of the goods they bought, and owing for nearly all of them. On October 7, McMillan, for the purpose of defrauding the creditors of A. D. McMillan & Co., sold all of their goods in lump, without invoice, to Charles Collins, through his agent, William H. Frease, for $7,500. At the time of purchasing, Frease did not inquire of A. D. McMillan whether the firm owed anything, and asked nothing whatever about their financial condition. At this time A. D. McMillan & Co. were indebted to their creditors for goods purchased, over $18,000. The stock sold by McMillan to Collins on October 7th was worth about $12,000, although some of the estimates of the value of the stock at the time of the sale were as high as $15,000 to $18,000. Collins is a cattle-dealer, residing in Reno county, in this state, and a man of considerable wealth. At the time of the purchase he had $20,000 on deposit in one of the banks of his county. On and prior to October 7, William H. Frease was employed by Collins as general manager of a store owned by him at Nickerson, in this state. The store carried a stock of about $6,000 of general merchandise. On October 6, 1882, Frease received a telegram from A. D. McMillan to come to Topeka. He arrived there at three o'clock on the morning of October 7th, and met McMillan at the Gordon House. After breakfast he went over to North Topeka with McMillan, and bought for Collins all the goods in the store for $7,500. The bargain was concluded about eleven o'clock A. M., McMillan accepting in payment of the stock the note of Charles Collins, executed by Frease, for $7,500, due in sixty days. Frease paid $200 to McMillan on the note. He took possession of the goods

about noon of October 7th — Saturday — and immediately pro-
cured teams, engaged cars, and began to ship the goods out of
the store to the depot, to be hauled off, and was so engaged
when the attachments of the creditors of A. D. McMillan &
Co., to the amount of over $18,000, were levied upon the stock.
There is some contradiction in the evidence as to the value of
the goods Collins actually got away with, but Frease testifies
that the sugar received and retained by Collins was worth
$260.   On Sunday morning, October 8, Collins reached To-
peka.   Soon after his arrival Frease informed him about the
transaction, and also informed him that the creditors of A. D.
McMillan & Co. had attached the stock.   At this time a large
number of the creditors of A. D. McMillan & Co., or their
representatives, had arrived at Topeka, and Collins became
fully informed of the fraudulent scheme of McMillan & Co.
in disposing of their goods to defraud their creditors.   After
this, Collins hunted up McMillan and tried to get his note
executed for the stock.   Collins told McMillan "there was
going to be a law suit; that the creditors had run attachments
on the goods, and that he did not want to have any trouble
about it."   McMillan insisted to Collins "that the same was
fair and square."   Collins then proposed to McMillan to pay
him a thousand dollars if his note was put in somebody's
hands, to be held until this case was decided.   McMillan first
demanded $1,500, but finally dropped down to $1,000, and
Collins agreed to give him a little money along from time to
time, not exceeding $1,000.   Hiram Raff, then postmaster at
Hutchinson, in Reno county, was agreed upon as the party to
hold the note, with the understanding between Collins and
McMillan that the note should remain in Raff's hands pending
this action, and if Collins lost the suit, it was not to be paid.
Under this arrangement, the note was turned over to Raff, and
he now holds the same.   After this Collins paid McMillan
from time to time certain sums of money, not amounting, how-
ever, to the $1,000 agreed upon.

As McMillan & Co. sold their stock of goods with the in-
tent to defraud their creditors, if Frease, the agent of Collins,

had knowledge of such intent, the transaction, not being *bona fide*, must be deemed fraudulent as against the creditors of McMillan & Co. So, also, if Frease, as the agent of Collins, did not have actual knowledge of the intent of McMillan & Co., yet if his situation was such that as a reasonably prudent man he could and would have known of the fraudulent intent, the transaction must also be deemed fraudulent. A vendee cannot blind his eyes to facts which surround him, and protect himself by claiming that he had no actual knowledge of his vendor's fraudulent intent. A knowledge of facts sufficient to put one upon inquiry, is equivalent to actual knowledge of the ultimate fact. (*Kurtz v. Miller*, 26 Kas. 314.) If the circumstances surrounding the purchase by Frease were such as would put a prudent man upon inquiry, which if prosecuted diligently would have disclosed the fraud of McMillan & Co., Collins cannot be deemed a *bona fide* purchaser. (*McDonald v. Gaunt*, 30 Kas. 693.)

Again, the rights of a vendee, innocent of the fraudulent intent of the vendor, are only protected where such vendee gives a valuable consideration. If there be no valuable consideration, the mere acceptance of the transfer by the vendee does not make the transaction a *bona fide* one. Where a valuable consideration is paid in good faith for a transfer from the vendor, who acts with fraudulent intent, the interest of the creditor is superseded. The innocent purchaser, in such a case, having parted with value upon the faith of the vendor's possession and ownership of the property, acquires not only the legal title, but an equity which is paramount to that of the creditors of the failing and fraudulent debtor. So, in this case, if it be conceded that the transaction between Collins and McMillan was in good faith, so far as Collins is concerned, yet if there was no consideration, the interest of the creditors is paramount to any claim of Collins. More than this, the protection to which a *bona fide* purchaser without notice is entitled, extends only to money which has been actually paid, or to securities or property which have been actually appropriated by way of

1. Fraudulent
sale; title of
purchaser;
notice.

payment before notice, and notice before actual payment of all the purchase-money is binding as to the consideration not paid, in the same manner as notice had before the contract. In other words, to entitle a person to the character of a *bona fide* purchaser without notice, he must have acquired the legal title and have actually paid the purchase-money, or parted with something of value by way of payment before receiving notice. And even if notice is only after a payment of a part of the purchase-money, the purchaser is only entitled to reimbursement for the money paid. Before A. D. McMillan or McMillan & Co. had ever parted with the note executed by the agent of Collins, Collins had full notice of their fraud. The only money paid by Collins or his agent before the attachments were levied upon the goods in controversy, was the sum of $200. Collins has received for this $260 worth of goods, which he has converted to his own use. He therefore has been reimbursed for all money paid by him upon the purchase. All the moneys paid subsequently upon the note were paid by Collins with full knowledge of the fraud, and Collins cannot be heard to say that he made these payments in ignorance of the rights of the creditors. The note executed for the purchase of the goods was placed in the hands of Raff, and therefore could not be sold or negotiated to the injury or prejudice of Collins. Indeed, it does not clearly appear that the note was payable to the order of McMillan & Co., or to bearer. It may have been a non-negotiable note; but in any event, it never passed out of the hands of McMillan & Co. to any *bona fide* holder, and Collins never paid anything upon the note, except $200, until after the note had been deposited with Raff. These sums, whatever they were, were paid by Collins at his own peril, with full knowledge of the fraud of his vendors. As Collins ascertained, soon after his arrival at Topeka, full knowledge of the fraudulent purpose of McMillan & Co., he could, if an innocent purchaser, have immediately brought an action to rescind the sale and cancel the note, as the note was then in the hands of McMillan. Even after Collins had entered into

*2. Purchaser, protected to what extent.*

an agreement to pay McMillan $1,000 and to put the note in
Raff's hands to be held until the determination of this action,
he could have protected himself from the payment of any of
this money by an action against McMillan & Co., if the pro-
mise to pay $1,000 was obtained by the fraudulent statements
of McMillan that the note had already been negotiated.

Among other instructions prayed for by defendant below,
was one to the effect that if Collins received notice that the
sale of McMillan & Co. was fraudulent as to the creditors, he
would be protected only to the amount and extent of the pay-
ment made before receiving such notice, and if he had taken
goods from the stock so purchased exceeding in value the
amount he had paid, and converted the same to his own use,
he could not recover.   This instruction was refused, and the
court nowhere in its charge informed the jury that Collins
could not be a *bona fide* purchaser unless he paid the purchase-
money before he had notice of the fraud of McMillan & Co.
If his note had been negotiable and had passed out of the
hands of McMillan & Co. before notice of the fraud to Collins,
the result would have been the same as though Collins had
actually paid the money at the time of his purchase of the
stock of goods; but the consideration in money, note, or other-
wise, must in all cases like this, to protect the purchaser
against attaching creditors, be actually passed before notice.
The judgment rendered for Collins was to the amount of
$9,000.   As the purpose of McMillan & Co. was to defraud
their creditors, and as Collins did not pay and has not yet
paid all the purchase-money, even if he bought without notice
of the fraudulent intent on the part of McMillan & Co. he is
not a purchaser for a valuable consideration, as to the pur-
chase-money not paid, and is not entitled as against the cred-
itors of McMillan & Co., to the goods seized by the sheriff
upon the attachments, and the judgment is therefore wholly
unsupported by the evidence.   The trial court refused to in-
form the jury of the effect of the failure of Collins to pay the
purchase-money, and the judgment must be set aside.

Upon the argument, it was insisted by the counsel of Collins

that the judgment should stand, because Collins was liable to certain creditors of McMillan & Co. under proceedings in garnishment which had been instituted against him. It affirmatively appears from the record that Collins had notice of the fraud of McMillan & Co. before the notices of garnishment were served upon him. In any event, he is not liable as a garnishee if he is not indebted to McMillan & Co. · On account of the fraud of McMillan & Co., Collins is not liable upon the note in the hands of Raff. The interest of the creditors who attached the goods in controversy is paramount to . any claim of Collins, is also paramount to any claim of McMillan & Co., or of creditors who have simply garnished Collins as the debtor of McMillan & Co. The failure in the title to the goods purchased by Collins from McMillan & Co. exonerates him from paying the purchase-price. (*Dixon v. Hill*, 5 Mich. 404; Kerr on Fraud, 318; Bump on Fraudulent Conveyances, 2d ed., 194–201.)

As an apology for the failure of the trial court to properly direct the jury, and for the judgment in this case, counsel of Collins insist that the subsequent arrangement entered into between Collins and McMillan as to the disposition of the note executed by Collins, was not set forth in the answer. This was not necessary. Collins alleged in his petition that he was the owner and in possession of a stock of goods and merchandise, which the sheriff of Shawnee county had seized and taken possession of in his official capacity, and demanded damages therefor in the sum of $25,000. The sheriff filed an answer denying the allegations of the petition, and setting up that the goods and merchandise seized by him were the property of McMillan & Co., and that upon several writs of attachment, (giving the names of the parties thereto,) he seized and took possession of the goods and merchandise in dispute, and further alleged in his answer that the sale from McMillan & Co. to Collins was fraudulent and void, and made with the intent to defraud the creditors of McMillan & Co., and especially the creditors named in the attachment proceedings. In support of this answer, the sheriff had a right to prove that

Collins was not a purchaser for a valuable consideration. He had the right to show that the note which Collins had executed was non-negotiable; that even if negotiable, it had never passed out of the hands of McMillan & Co. to a *bona fide* holder. No one but a purchaser for a valuable consideration can claim title to property which has been fraudulently disposed of against the action of attaching creditors. The arrangement entered into between Collins and McMillan & Co. on October 9, 1882, fixed conclusively the transfer of the stock of goods to Collins without consideration, excepting as to the $200 already paid, and Collins has received and converted to his own use goods in excess of that amount. This arrangement was disclosed by Collins upon his own examination.

A great many other questions are presented and discussed, but in view of the undisputed fact that the sale of McMillan & Co. was to defraud their creditors, and that Collins was not a purchaser for a valuable consideration as to the purchase-money not paid, it is unnecessary to comment upon these matters.

The judgment of the district court will be reversed, and the cause remanded for a new trial.

VALENTINE, J., concurring.